UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


UNITED STATES OF AMERICA *
            V.            *     Case No:  2:14-cr-19-1
RICHARD CYR            *




                    PENDING MOTIONS
                    OCTOBER 9, 2014
                  BURLINGTON, VERMONT


BEFORE:
     THE HONORABLE WILLIAM K. SESSIONS III
     District Judge

APPEARANCES:

     Christina E. Nolan, Esq., Assistant United States
Attorney, P.O. Box 570, Burlington, VT  05402-0570; Attorney
for the Plaintiff.

     Maryanne E. Kampmann, Esq., Stetler, Allen & Kampmann, 95
St. Paul Street, Burlington, VT  05401; Attorney for the
Defendant.



Court Reporter:  JoAnn Q. Carson, RMR, CRR




                 CAPITOL COURT REPORTERS, INC.
                       P.O. BOX 329
               BURLINGTON, VERMONT  05402-0329
                     (802/800) 863-6067
            E-MAIL:  Info@capitolcourtreporters.com

INDEX

| Witness | Page |
|---------|------|
| Scott Clouatre | 3 |
| Direct Examination by Ms. Nolan | 4 |
| Cross Examination by Ms. Kampmann | 23 |
| Redirect Examination by Ms. Nolan | 63 |
| Recross Examination by Ms. Kampmann | 69 |

| Exhibits | Description | Page |
|----------|-------------|------|
| Plaintiff | | |
| 1 | Search Warrant, Attachment A, Affiavit | 17 |
| 2 | Affidavit Re:  Gmail | 23 |
| 3 | Affidavit Re:  Hotmail | 23 |
| 4 | Affidavit Re:  Facebook | 23 |
| 5 | Facebook Search Warrant | 72 |
| Defendant | | |
| A | Search Inventory | 60 |

1  (Beginning at 9:38 a.m.)

2        JUDGE SESSIONS:  Good morning.

3        MS. KAMPMANN:  Good morning, Your Honor.

4        COURTROOM DEPUTY:  Your Honor, this is criminal

5  number 14-cr-19 United States of America versus Richard Cyr.

6  Present for the Government is Assistant United States Attorney

7  Christina Nolan.  The Defendant is present with his attorney

8  Maryanne Kampmann.  The matter before the Court is pending

9  motions.

10        JUDGE SESSIONS:  Okay.  There's a motion to dismiss

11  which has been filed by the Defendant and also a motion to

12  suppress, and are the parties ready to proceed on the motion to

13  suppress at this point?

14        MS. NOLAN:  Yes, Your Honor.

15        JUDGE SESSIONS:  Any witnesses to be called?

16        MS. NOLAN:  We do have Detective Scott Clouatre, Your

17  Honor, who authored the affidavit and search warrant in

18  question.

19        JUDGE SESSIONS:  Okay.  Any witnesses to be called by

20  the Defense?

21        MS. KAMPMANN:  It depends on how this testimony goes.

22        JUDGE SESSIONS:  Okay.  All right.  You can proceed.

23        MS. NOLAN:  Your Honor, the Government calls Scott

24  Clouatre.

25  SCOTT CLOUATRE,

1    Having been duly sworn, testified as follows:

2         JUDGE SESSIONS:  Good morning, Detective.

3         DETECTIVE CLOUATRE:  Good morning, sir.

4                    DIRECT EXAMINATION

5    BY MS. NOLAN:

6    Q.    Good morning, Detective.

7    A.    Good morning.

8    Q.    Would you state your name again for the record?

9    A.    Scott Clouatre.

10   Q.    How are you employed?

11   A.    I'm with the Orange County Sheriff's Department

12   currently assigned to the Special Investigations Unit.

13   Q.    Would you please tell the Court what the Special

14   Investigations Unit is?

15   A.    It's a unit that investigates child abuse, child sex

16   crimes, and sex crimes in general.

17   Q.    And of the crimes that you just mentioned is there -- is

18   one of them the majority of the cases you investigate?

19   A.    Most of my investigations involve around child abuse and

20   child sex crimes.

21   Q.    How long have you been with the Orange County -- you

22   call it the SIU?

23   A.    Yes, ma'am.

24   Q.    How long have you been with the Orange County SIU?

25   A.    It's a year now.

1  Q.    Did you have some training with respect to child --

2  investigation of child abuse crimes in connection with the job?

3  A.    I have.  I've been trained in both advanced and basic

4  forensic interviewing of children.  Various interviewing and

5  interrogation techniques.

6  Q.    Where did you have that training?

7  A.    In Huntsville, Alabama at the Child Advocacy Center.

8  Q.    Prior to joining the SIU -- by the way is the SIU -- are

9  the officers in that unit all from the Orange County Sheriff's

10  Department?

11  A.    Yes, they are.

12  Q.    Prior to joining that unit did you have some prior

13  experience in law enforcement?

14  A.    I've been a full time certified law enforcement since --

15  officer since 2007.  Before I came to the SIU I was employed by

16  the Randolph Town as a patrol officer.

17  Q.    Is there any way for you to estimate how many child

18  sexual exploitation or -- and/or child abuse investigations you

19  have been involved in?

20  A.    I did a count.  Currently on my desk I have 15 open

21  child cases currently right now.

22  Q.    Okay.  Are you familiar with someone named Richard Cyr?

23  A.    Yes, ma'am.

24  Q.    How are you familiar with him?

25  A.    He was a suspect in an investigation that I conducted.

1  Q.    Okay.  What type of investigation?

2  A.    It was a child luring, sex assault.

3  Q.    Of a child?

4  A.    Of a child.

5  Q.    Do you see Richard Cyr in the courtroom today?

6  A.    Yes, ma'am.

7  Q.    Would you identify him by pointing him out and

8  describing what he's wearing?

9  A.    He's over there wearing the gray sweatshirt.

10        MS. NOLAN:  Your Honor, may the record reflect the

11  identification?

12        JUDGE SESSIONS:  It may.

13 BY MS. NOLAN:

14  Q.    Can you tell the Court how and when this investigation

15  of Richard Cyr began?

16  A.    It started on the 16th of October 2013 where a mother

17  had called in to the SIU reporting that her 15-year-old

18  daughter was sexually assaulted.

19  Q.    Okay.  Did you -- were you able to -- how were you able

20  to identify Richard Cyr as the suspected -- the suspect?

21  A.    Through our investigations we interviewed the

22  15-year-old female.  She gave a great description of the

23  vehicle that was used in transporting her for the actual act,

24  and in so doing that we located the vehicle.  A record check

25  with Vermont Department of Motor Vehicles led to the name of

1  Carmella Cyr.  Further record checks she had a son named

2  Richard Cyr.  We did a photo lineup of Mr. Cyr that the victim

3  identified, and we also --

4  Q.     She identified Richard Cyr in the lineup?

5  A.     Yes, ma'am.  We also had an undercover officer posing as

6  the victim on the Facebook media.

7          MS. KAMPMANN:  Objection, Your Honor.  I would

8  appreciate if we refer to the juvenile in this case as the

9  complainant.

10         JUDGE SESSIONS:  As opposed to what?

11         MS. KAMPMANN:  The victim.  There's an allegation

12 here.  There's been nothing established.

13         JUDGE SESSIONS:  Well this is -- this is -- I mean

14 it's fine.  That's fine.  You can actually refer to her as the

15 complainant, but this is a court hearing.  This is not

16 something in front of a jury.  I don't think we need to be

17 overly sensitive about that particular issue, but anyway if you

18 want to refer to her as complainant, you can do so.

19 A.     Yes, Your Honor.

20 Q.     Or the 15-year-old girl.  Okay.  And so did you learn --

21 I'm sorry.  You were in the middle of talking about an

22 undercover step that was taken?

23 A.     We had an undercover officer posing as the complainant

24 on the social media site of Facebook that was engaged in

25 communications with one Ann Clancy.  We also did a record

1   search of Ann Clancy and we have come up with such person as

2   this.

3   Q.     Okay, and that car that you found that you located that

4   matched the detailed description that the complainant gave, did

5   you learn where -- what address that car was registered to?

6   A.     It was.  It was address 20 -- 1781 Tatro Hill Road in

7   Randolph, Vermont.

8   Q.     And did you learn who lived there as a records check?

9   A.     It was both Carmella Cyr and Richard Cyr.

10   Q.     And would you describe what the premises looked like at

11   1781 Tatro Road?

12   A.     There's two building on the property; one being a main

13   residence and another building being an apartment type

14   building.

15   Q.     Now I want to direct your attention to October 25, 2013.

16   Can you describe for the Court what, if anything, you did in

17   the morning of October 25, 2013 relative to this investigation?

18   A.     During that morning we conducted another interview of

19   the complainant who disclosed more detail regarding a sexual

20   assault.  That gave us probable cause for arrest.

21   Q.     What offense did it give you probable cause for?

22   A.     Sexual assault on a minor.

23   Q.     Did you have probable cause before the interview that

24   morning of the complainant?

25   A.     It was pretty thin.

1  Q.    Okay.  Did you -- did she describe sexual acts committed

2  by the Defendant in that interview that fall within the sexual

3  assault statute?

4  A.    Yes, she did.

5  Q.    As a result of what she told you did you attempt to make

6  contact with the Defendant that day?

7  A.    Yes, we did.

8  Q.    Did you in fact make contact that day?

9  A.    Yes, we did.

10 Q.    When did you make contact with him?  Time of day.

11 A.    It was approximately three in the afternoon.

12 Q.    Can you describe for the Court the circumstances under

13 which you made contact with him, particularly where you found

14 him?

15 A.    Both myself and another deputy traveled to the residence

16 of 1781 Tatro Hill Road where we in fact met Mr. Cyr.  He was

17 outside moving items from the apartment building into a

18 vehicle.  The vehicle was the same vehicle in question, the

19 silver PT Cruiser that we had identified earlier on.

20 Q.    And where was he moving to?

21 A.    He said he was moving back up to the main residence.

22 Q.    From the apartment building?

23 A.    From the apartment building.

24 Q.    And it was the same vehicle that the 15-year-old girl

25 had identified as the one he used to transport her?

1  A.    Yes, ma'am.

2  Q.    And to your knowledge did anyone else reside at 1781

3  Tatro Hill Road besides Richard Cyr and his mother?

4  A.    Not to my knowledge.

5  Q.    Did you learn from Richard Cyr where his mother was at

6  the time that day?

7  A.    We did.  She was at her place of work which was the

8  Randolph High School.

9  Q.    Okay.  Did he tell you when she was scheduled to finish

10 her shift?

11 A.    Approximately 11 p.m.

12 Q.    And did he tell you how she was supposed to get home

13 from her job?

14 A.    He was operating the vehicle to go pick her up.

15 Q.    Now did you arrest Richard Cyr at this time?

16 A.    Yes, we did.

17 Q.    This is for the sexual assault?

18 A.    For the sexual assault.

19 Q.    Where did you take him after you arrested him?

20 A.    We transported him to the Orange County Sheriff's

21 Department.

22 Q.    Did you interview him once you got there?

23 A.    When we arrived to the Orange County Sheriff's

24 Department I read him Miranda and we did conduct an interview.

25 Q.    And about what time did that interview -- did he waive

1  Miranda by the way?

2  A.    He did.

3  Q.    About what time did that interview begin?

4  A.    It was approximately 4:15 in the afternoon.

5  Q.    Okay.  Come back to the interview in a second.  After

6  you arrested Richard Cyr did you give any directions to other

7  officers concerning the premises at 1781 Tatro Hill Road and

8  that vehicle, the PT Cruiser?

9  A.    I did.  I had two other deputies arrive, both Captain

10  Walsh and Sheriff Bohnyak, and instructed them to secure both

11  the property and the vehicle.

12  Q.    Okay, and secure means?

13  A.    It's to not allow anybody into the residence for

14  preservation of possible evidence that was inside those

15  buildings.

16  Q.    And the vehicle too?

17  A.    And the vehicle.

18  Q.    Why did you ask them to do that?  What were your

19  intentions?

20  A.    Once the interview was complete my intentions were to

21  draft a search warrant to execute it on the property.

22  Q.    Okay, and the vehicle too?

23  A.    And the vehicle.

24  Q.    You said the interview began around 4:15; is that

25  correct?

1   A.      Yes, ma'am.

2   Q.      When did it end approximately?

3   A.      I had called the court clerk for bail and court

4   conditions.  It was after -- I'm sorry.  I do not recall the

5   time.  It was around 8-ish.

6   Q.      Around 8.  When you say called the clerk -- the court

7   for the conditions what do you mean by that?

8   A.      If we arrest a suspect for committing a crime and they

9   are going to be in jail, we have to call for conditions and

10  bail from -- because it was after hours, court hours.  So we

11  have to call the court clerk.

12  Q.      So you remember the interview ending around the time

13  that you called the court for conditions?

14  A.      Yes, ma'am.

15  Q.      So it was close to a four-hour interview; is that

16  correct?

17  A.      I would say three hour.

18  Q.      Okay.  And then after you called the court for

19  conditions did you begin the process of drafting the search

20  warrant paperwork?

21  A.      Yes, I did.

22  Q.      Had you begun the process prior to the completion of the

23  interview?

24  A.      No.  I did have a boilerplate and part of an affidavit

25  that I had written for a Facebook warrant.

1  Q.    In this case?

2  A.    In this case.

3  Q.    Did you use some of the affidavit that you used for the

4  Facebook search warrant in the drafting of this affidavit?

5  A.    Yes, I did.

6  Q.    What documents did you have to draft around 8 o'clock?

7  A.    The search warrant, Attachment A, the affidavit, and the

8  application of the warrant.

9  Q.    And do you recall about when you finished drafting these

10 documents?

11 A.    It was around 9 p.m.

12 Q.    The affidavit that you borrowed from in drafting the

13 search warrant for 1781 Tatro Hill Road and the vehicle was --

14 that affidavit was for Facebook communications concerning Ann

15 Clancy?

16 A.    Yes, ma'am.

17 Q.    And that you actually received -- a state judge actually

18 issued a warrant for Facebook communications concerning Ann

19 Clancy?

20 A.    Yes, ma'am.

21 Q.    That was four days earlier?

22 A.    Yes, ma'am.

23 Q.    And which judge was that?

24 A.    Judge Robert Gerety.

25 Q.    Now you did not -- did you use the same Attachment A?

1  Was that Attachment A unique to the search of the 1781 Tatro

2  Hill Road and the vehicle?

3  A.    Yes, it was.

4  Q.    You had to write that one tailored to that particular

5  search?

6  A.    Yes, ma'am.

7  Q.    Now when you were writing the affidavit were the

8  officers still securing the premises?

9  A.    Yes, they were.

10  Q.    Do you recall how many there were at this time?

11  A.    Total there was approximately between seven and eight.

12  Q.    In your mind were you working under some time

13  constraints?

14  A.    Yes, ma'am.

15  Q.    Could you explain to the Court why you felt you were

16  working under time constraints?

17  A.    With Vermont state warrants they are -- usually are

18  granted to be executed between the hours of 6 a.m. and 10 p.m.

19  The judge can grant exceptions, but at the time of drafting

20  that warrant we were unsure if we were going to get such

21  exception.

22  Q.    Did you actually get an exception ultimately?

23  A.    We did.

24  Q.    Okay.

25  A.    And we also were working with the constraint that

1  Carmella was going to be coming home soon and we wanted to

2  preserve what evidence was in the residence without her coming

3  into it.

4  Q.    Okay.  When you finished drafting the search -- the

5  various search warrant, the application and affidavit, and

6  Attachment A for the Cyr residence and his vehicle, did you

7  send it to anyone to review for any legal issues or just to

8  review?

9  A.    I did.  I sent it to the Orange County State's Attorney

10  Lou Porter.

11  Q.    And how did you send it to him?

12  A.    I sent it via e-mail.

13  Q.    And did he review it?

14  A.    He did.

15  Q.    Did you talk to him about it?

16  A.    I did.  He had some corrections concerning the affidavit

17  portion.

18  Q.    Did he have any corrections to Attachment A?

19  A.    No.

20  Q.    Did he say he approved those?

21  A.    He did.

22  Q.    And did you send it to a judge?

23  A.    I did.

24  Q.    Can you describe for the Court that process?

25  A.    I was -- right after I had spoken to the State's

1  Attorney Lou Porter, I contacted Judge Robert Gerety via phone.

2  Q.    This is a state District Court judge?

3  A.    He's the Orange County State District Judge.

4  Q.    Okay.

5  A.    He --

6  Q.    What time is this that you contacted him?

7  A.    Again this was after 9.

8  Q.    Okay.

9  A.    9:30-ish.

10  Q.    Okay.  Continue.  Sorry.

11  A.    Apprised him of what was going on.  He advised me to

12  send it -- scan -- sign it, scan it, send it to him via e-mail

13  which I did.  Soon after he called.  He did not have any issues

14  with the warrant.  He rendered the oath over the phone and

15  approved the warrant so to speak.

16  Q.    And did he sign it?

17  A.    He did.

18  Q.    And he put the time that he signed it on the warrant?

19  A.    Yes, he did.

20  Q.    And you had signed it by telephone or -- I'm sorry.  You

21  signed it and then emailed it to him, correct?

22  A.    Yes, ma'am.

23  Q.    I'm going to approach.  What's been marked Defense

24  Exhibit A in the briefing and Government's Exhibit 1 also for

25  purposes of this hearing, would you take a look at this

1 document and tell the Court if you recognize it?  May be more

2 than one document in there.

3 A.     This is the search warrant application, Attachment A,

4 and affidavit that I had drafted.

5        MS. NOLAN:  Your Honor, we move the admission of

6 exhibit 1.

7        JUDGE SESSIONS:  Any objection?

8        MS. KAMPMANN:  No objection.

9        JUDGE SESSIONS:  So admitted.

10 (Government Exhibit 1 admitted.)

11 BY MS. NOLAN:

12 Q.     What did you do once Judge Gerety signed the warrant?

13 A.     I immediately phoned -- called the Captain who was --

14 who was still on scene, advised him that the Judge had signed

15 off on the warrant and to begin the search.

16 Q.     And during this phone call did you tell the Captain

17 which crimes law enforcement had probable cause to search for?

18 A.     I did.  I advised him that it was a sexual assault of a

19 minor, luring a minor via the internet, and delinquency to a

20 minor.

21 Q.     Did you tell him which -- what types of things law

22 enforcement had probable cause, authorization to seize?

23 A.     I did.  It was computer and electronic media.

24 Q.     What did you do after Judge Gerety signed the warrant?

25 A.     Immediately after I got off the phone with Captain Walsh

1  I left the SIU and traveled to the high school to pick up

2  Carmella because it was about that time that she was awaiting

3  for Richard.

4  Q.    Okay.  And you, in fact, picked her up?

5  A.    Yes, ma'am.

6  Q.    Did you give her a copy of the warrant?

7  A.    I did.

8  Q.    Where did you go from there?

9  A.    We went right from the high school to the residence.

10  Q.    Okay.  Did you tell her what was going on?

11  A.    I did.  I advised her that there was currently a search

12  warrant being executed on the residence and Richard was in our

13  custody for sexual assault on a minor.

14  Q.    And how far along -- when you arrived at the residence

15  was the search underway?

16  A.    It was.

17  Q.    How far -- what time was it when you arrived?

18  A.    After 11.

19  Q.    Okay.  Did you have a copy -- did you have the warrant

20  and application when you arrived at 1781 Tatro Hill Road?

21  A.    I did.

22  Q.    And what was Ms. Cyr's reaction to being told what was

23  going on?  What was she acting like when she arrived at the

24  residence?

25  A.    She was very upset.  There was quite a lot of police

1  cars packed in the yard.  There was a lot of people walking

2  around.  She was very upset with this.  Borderline belligerent.

3  When we arrived I assumed duties to figure out what items to

4  seize, and I had Carmella speak to the Sheriff who was also on

5  the scene.

6  Q.    And did you ever hear any of their conversation?

7  A.    I did.  She made something to the effect that this was

8  all a conspiracy theory because she had placed her name on the

9  petition regarding President Obama.

10  Q.    Okay.  And where did she go during the search?  Where

11  was she during the search?

12  A.    After she was speaking to Sheriff Bohnyak they both went

13  up to the main residence where the full search was underway.

14  Q.    And you searched both the main residence and the out

15  building, correct?

16  A.    And the vehicle.

17  Q.    And the vehicle.  Do you recall was much taken from the

18  main residence?

19  A.    Not from the main residence.

20  Q.    Okay.  And she was there the whole time?

21  A.    Yes, ma'am.

22  Q.    Now you said you were the officer in charge of the

23  search?

24  A.    Yes, ma'am.

25  Q.    Did you take on -- did anybody take on the

1  responsibility to make sure that each item seized fell within

2  the ambit of the search warrant?

3  A.      In my absence before I got there it was Captain Walsh's

4  duty.

5  Q.      Did you take on that duty when you arrived?

6  A.      Yes, ma'am.

7  Q.      Did you see every item that was seized?

8  A.      All the items seized were placed into my cruiser, and as

9  I arrived on scene I went through those items to make sure they

10  did fall under the search warrant parameters.

11  Q.      And Attachment A is the warrant that described the items

12  to be seized, correct?

13  A.      Yes, ma'am.

14  Q.      Were you aware in drafting the warrant that the warrant

15  needed to list the offenses for which you had probable cause to

16  search?

17  A.      Yes, I was.

18  Q.      And Attachment A refers to violations of statutes listed

19  on the warrant, correct?

20  A.      Yes.

21  Q.      And the warrant doesn't list any statutes, does it?

22  A.      No, it does not.

23  Q.      The warrant application does; is that correct?

24  A.      Yes, it does.

25  Q.      And so there's an error in the drafting of Attachment A;

1  is that correct?

2  A.     Yes, it is.

3  Q.     Was it -- why did you omit that word?  Was it

4  intentional?  Was it inadvertent?

5  A.     It was an inadvertent typo on my end.

6  Q.     Now was there child pornography found on the computer

7  seized from Mr. Cyr's residence?

8  A.     Yes.  There was.

9  Q.     Can you describe that to the Court?

10  A.     It was from a -- the photos were located on the hard

11  drive; was photos of a 15, 16-year-old female that was

12  identified being a juvenile that lives in the Town of Randolph.

13  Those files -- those photos consisted of nude, semi-nude, and

14  even some very explicit sexual photos.  Those files -- those

15  photos were all found in a file labeled KP the slut.

16  Q.     You're using her initials?

17  A.     Yes, ma'am.

18  Q.     And were there -- in this investigation were there

19  Facebook communications discovered between the Ann Clancy

20  account and KP?

21  A.     There was.

22  Q.     And did those Facebook communications reveal how Mr. Cyr

23  posing as Ann Clancy was able to obtain those sexually explicit

24  photos?

25  A.     From the contact and messages it's believed KP was with

1   the understanding she was speaking to another female and a

2   possible lesbian sexting communication.

3   Q.      She didn't know who she was talking to?

4   A.      No.

5   Q.      Did the person using the Ann Clancy account encourage

6   her to send those?

7   A.      Yes.

8   Q.      And there was paperwork found in the residence of

9   evidentiary value, the out building?

10  A.      Yes, there was.

11         MS. NOLAN:  Your Honor, we would move the admission

12  -- I attached them to my brief -- but of exhibits -- Government

13  exhibits 2 through 4 which are Special Agent Michelle Delpha's

14  affidavits and search warrants for the gmail -- the gmail

15  account associated with Richard Cyr, the hotmail account, and

16  the Facebook account that we did federally which is a broader

17  than the state warrant just to -- just for the completeness of

18  the record, because I think there's an argument that those

19  warrants flowed from the search of the residence and we're

20  arguing --

21         JUDGE SESSIONS:  And your argument those were

22  obtained independently of the actual search here?

23         MS. NOLAN:  Yes, Your Honor.

24         JUDGE SESSIONS:  So, therefore, they are relevant.

25  Any objection?

1      MS. KAMPMANN:  No objection.  I agree that they are

2   relevant.  It's my understanding that Agent Delfa is available

3   today and she may be brought back at a future date for

4   testimony.

5      JUDGE SESSIONS:  Okay.  That's fine.  So they are

6   admitted.

7   (Government exhibits 2-4 were admitted.)

8      MS. NOLAN:  Thank you, Your Honor.  This is exhibits

9   2 through 4.  Your Honor, I have no further questions of this

10  witness.

11     JUDGE SESSIONS:  Okay.  Any cross examination, Ms.

12  Kampmann?

13     MS. KAMPMANN:  Yes.  Thank you.  And if I may have a

14  moment?

15     JUDGE SESSIONS:  Yes.

16                   CROSS EXAMINATION

17  BY MS. KAMPMANN:

18  Q.    Good morning --

19  A.    Good morning.

20  Q.    -- Detective.  Am I -- would I be correct in

21  understanding that if you started a year ago with the Special

22  Investigation Unit, that this investigation would have been

23  your first investigation?

24  A.    It was actually my second, ma'am.

25  Q.    Okay.  And so when you say you currently have 15 open

1  cases, back then you had one open case and then you were

2  investigating this one; is that correct?

3  A.    Yes, ma'am.

4  Q.    All right.  Now you testified that the Special

5  Investigation Unit got a phone call from the mother of the

6  complainant on the 16th saying that her daughter had been

7  sexually assaulted?

8  A.    Yes, ma'am.

9  Q.    She didn't say she had been sexually assaulted, correct?

10  A.    Without looking at the affidavit I don't know the exact

11  terminology, ma'am.

12  Q.    Well isn't it true that you had to interview the

13  complainant in this case at least three times, in addition to a

14  fourth meeting during which she was asked to look at

15  photographs?

16  A.    That is true.

17  Q.    And isn't it true that she initially didn't say she had

18  been sexually assaulted?

19  A.    Alluded to the fact, but we didn't have the details of

20  the sexual assault at the time during the first interview.

21  Q.    Well because there was no allegation of a sexual assault

22  when you first got involved, correct?

23  A.    We had -- we had speculation that something did happen,

24  but yes, ma'am.

25  Q.    Okay.  So there wasn't a report of a sexual assault?

1  A.    No.  That is what was reported from the mother.

2  Q.    When you say you need to refer to the affidavit which

3  affidavit are you talking about?

4  A.    Right on the warrant, ma'am.

5  Q.    I'm going to show you what's marked as -- we'll use the

6  Government exhibit 1.

7  A.    Thank you.

8  Q.    You're welcome.

9  A.    Right in the column dated number one.

10  Q.    Okay.  And what does it say?

11  A.    It says on October 16, 2013 the Orange County Special

12  Investigation Unit, SIU, received a report of an alleged sexual

13  assault that happened on a 15-year-old female.

14  Q.    Now when you first got involved in that hadn't Mrs. --

15  hadn't the mother of the complainant said that her daughter had

16  met with somebody?

17  A.    That was later on.  That was all part of the initial

18  report, ma'am.

19  Q.    I'm sorry.  What was all part of the initial report?

20  A.    That she had met with somebody.  It was all part of the

21  initial part she reported to the SIU.

22  Q.    Right, but you didn't have any evidence of an allegation

23  of sexual assault until at least the second, if not the third,

24  time you interviewed the complainant in this case, correct?

25  A.    Right.  It was a -- right.  We had no evidence of the

1  sexual assault.  Right.

2  Q.    Okay.

3        JUDGE SESSIONS:  Well in paragraph 2 actually, and

4  her name is used here, said her daughter had disclosed to her

5  that she had been molested by an unknown male.  Did you learn

6  that during that first contact with the mother or was that in

7  hindsight after you had conducted further investigations?

8        DETECTIVE CLOUATRE:  It was in hindsight after

9  further investigation.

10       JUDGE SESSIONS:  Okay.

11  BY MS. KAMPMANN:

12  Q.    Well when you say in hindsight let's establish for the

13  Court what the dates of the interviews of the complainant were.

14  Can you do that?

15  A.    The initial complaint came in on the 16th and we

16  interviewed the complainant on the 17th.

17  Q.    Okay.  So let's get a couple of things straightened out.

18  So in paragraph 2 -- well in paragraph 1 you say that it was

19  October 16th that you got that report of an alleged sexual

20  assault, correct?

21  A.    Yes, ma'am.

22  Q.    Okay.  In paragraph 2 -- and that was two days after

23  whatever happened -- was alleged to have happened, correct?

24  A.    Yes, ma'am.

25  Q.    And in paragraph 3 when you say, and I won't read the

1  name, but the complainant's mother further reported the

2  complainant rode a bike to this prearranged location on October

3  16th, it wasn't October 16th, was it?

4  A.    No, it was not.

5  Q.    What date was it?

6  A.    It would have been the 14th.

7  Q.    Okay.  So this call doesn't even come in for two days?

8  A.    Right.

9  Q.    And you -- I'm sorry.  You told me you interviewed the

10  complainant on -- was it the 16th?

11  A.    The 17th.

12  Q.    17th.  I'm sorry.  And that's October of 2013?

13  A.    Yes, ma'am.

14  Q.    All right, and during that interview was it you who

15  interviewed her or was it somebody else?

16  A.    It was somebody else.

17  Q.    And who was that?

18  A.    It was Monique Levesque from the Hartford DCF Office.

19  Q.    And you observed that interview from behind an one-way

20  glass?

21  A.    We have a separate room that's monitored via video and

22  audio, and we have an interview room that has both video and

23  audio, and there's a separate room with a TV screen.  We were

24  watching that -- that room.

25  Q.    Okay.  So you knew what the discussion was between the

1  complainant and Ms. Levesque on the 17th?

2  A.    Yes.

3  Q.    Okay, and you knew she did not make an allegation of a

4  sexual assault?

5        MS. NOLAN:  Your Honor, I'm going to object.  I think

6  maybe we'll touch on this in redirect, but sexual assault I

7  think is a legal term.  It can be both a legal term and a

8  colloquial term, and maybe it would be helpful if Ms. Kampmann

9  can clarify what she's asking, whether it fell within the legal

10  definition of sexual assault within the meaning of Vermont law

11  or whether -- you know, whether she's using it in a more

12  informal sense.

13        JUDGE SESSIONS:  Well how about if I try to clarify

14  it.  Detective, what did you -- you heard this interview with

15  the complainant, and what did she describe as having happened.

16        DETECTIVE CLOUATRE:  At the time I had possibly a

17  lewd and lascivious conduct, not a sexual assault by Vermont

18  statute.

19        JUDGE SESSIONS:  Okay.  And to that extent what did

20  she say happened?

21        DETECTIVE CLOUATRE:  I'm sorry, Your Honor.  I don't

22  recall.

23        JUDGE SESSIONS:  Okay.  All right.

24  BY MS. KAMPMANN:

25  Q.    Backing up a little bit on that search warrant, we're

1   looking at your affidavit, correct?

2   A.    Yes, ma'am.

3   Q.    And if you back up to the very first paragraph where it

4   says introduction and officer background?

5   A.    Yes, ma'am.

6   Q.    And that first paragraph where it's talking about

7   searching -- it's talking about searching the premises of 1781

8   Tatro Hill Road in Randolph, Vermont, correct?

9   A.    Yes, ma'am.

10  Q.    It doesn't say anything about searching the premises at

11  1779 Tatro Hill Road, correct?

12  A.    No, it does not.

13  Q.    And that would be the address of the apartment?

14  A.    I'm not aware of that.  I was with the understanding

15  they were both the same address.

16  Q.    Well if you go to the very front page, you included both

17  addresses there.

18  A.    Okay.

19  Q.    I'm sorry.  Yeah, the cover.  So you were aware that

20  there were two addresses?

21  A.    Yes, ma'am.

22  Q.    Okay.  And in this affidavit you don't make any mention

23  of that second address, correct?

24  A.    No, I do not.

25  Q.    And you don't make any mention of the PT Cruiser?

1  A.    No, I do not.

2  Q.    Now looking at paragraph 11 of your affidavit, based on

3  your interviews of the complainant in this case she never

4  reported in any of those four interviews that you had with her

5  that she had ever taken photographs of herself nude, correct?

6        MS. NOLAN:  Object to the relevance, Your Honor.  We

7  seem to be a little far afield from the challenge which is to a

8  particular area.

9        JUDGE SESSIONS:  So what is the relevance?

10        MS. KAMPMANN:  The relevance is that if you look at

11  the wording of the search warrant and the Attachment A and the

12  application, what you find is wording that one would typically

13  find in connection with a search warrant for in search of child

14  pornography, and it's our contention that there was no probable

15  cause to search for child pornography.  That the officers knew

16  that the only photographs that had been taken here had been

17  head shots of the complaining witness.  So there was no

18  probable cause to search for child pornography.

19        JUDGE SESSIONS:  Okay.  So objection overruled.  Go

20  ahead.

21  BY MS. KAMPMANN:

22  Q.    Do you remember the question?  You want me to ask it

23  again?

24  A.    Please ask again.

25  Q.    Okay.  So you knew, based on your interviews of the

1  complainant, that the child pornography wasn't an issue with

2  respect to her involvement with this individual, correct?

3  A.     With -- if you're taking from the number 11 regarding

4  what the complainant said it was only a head shot, which is not

5  viewed as child pornography.

6  Q.     All right, and now when you applied for the search

7  warrant for -- Detective, can I have your attention?

8  A.     Yes, ma'am.

9  Q.     When you applied for the search warrant for Facebook

10 records do you recall when you did that?

11 A.     I applied for the warrant four days prior.  So it would

12 have been the 21st.

13 Q.     Of October 2013?

14 A.     Of October.

15 Q.     Okay, and I'm assuming you were not writing the

16 affidavit under the sort of time constraints that you described

17 for us on direct examination with respect to this search

18 warrant.  Is that fair to say?

19 A.     Yes, it is.

20 Q.     I'm going to show you what is marked as Government's

21 exhibit 5.  Actually, Detective, if I may, I'm going to give

22 you the one that's got the original sticker on it.  It's the

23 same document.  Thank you.

24 A.     Okay.

25 Q.     Okay.  Have you had a chance to review that?

1  A.    Yes, ma'am.

2  Q.    And can you identify it for the Court please?

3  A.    It is the search warrant that I completed for Facebook

4  accounts for the complainant Ann Clancy.

5  Q.    Okay, and we have there the cover page.  What is that?

6  A.    It is what the Court uses.

7  Q.    What's it entitled?

8  A.    A notice of law enforcement regarding search warrants.

9  Q.    Okay, and then the second page is the search warrant

10  itself?

11  A.    Yes, ma'am.

12  Q.    And that is two pages long?

13  A.    Yes, ma'am.

14  Q.    And then behind that is the application for the search

15  warrant?

16  A.    Yes, ma'am.

17  Q.    Which is also two pages long?

18  A.    Yes, ma'am.

19  Q.    And then we have your affidavit attached to that; is

20  that correct?

21  A.    Yes, ma'am.

22  Q.    And that's three pages long?

23  A.    Yes, ma'am.

24  Q.    And that is 20 paragraphs long?

25  A.    Yes, ma'am.

1  Q.    All right.  So just first you told us on direct that it

2  was just an inadvertent omission that you hadn't listed the

3  crimes on the search warrant, correct?

4  A.    Right.

5  Q.    Can you tell us on this search warrant, where you were

6  not under any time constraint, where you have listed the

7  crimes?

8  A.    It's on the second page of the application.

9  Q.    Well I'm asking first if you could look at the search

10 warrant itself, the two-page search warrant.

11 A.    Yes, ma'am.

12 Q.    Okay.

13 A.    They are not on the search warrant.

14 Q.    It's not listed there at all?

15 A.    The violations are not listed on the search warrant.

16 Q.    Okay.  And you don't have a paragraph in there that says

17 that either the affidavit or the application is in any way

18 incorporated into the search warrant, do you?

19 A.    No, I do not.

20 Q.    So when you say it was an inadvertent omission on

21 October 25th when you applied for the search warrant for Mr.

22 Cyr's home and possibly the apartment and possibly the PT

23 Cruiser, it was actually quite consistent with what you had

24 done previously?

25 A.    So it's been errors all along the way.  Yes.  You're

1 right.  It is consistent.

2 Q.    Okay.  But you testified on direct that you were well

3 aware that you were supposed to list those on the search

4 warrant itself?

5 A.    On the warrant, right.  I was aware that the offenses do

6 go on the warrant.

7 Q.    Okay, and I understand that you're saying there was some

8 time constraint on the 25th when you were drafting your

9 warrant, but if you could take just a moment to compare, isn't

10 it true that the first 17 paragraphs of the October 25th search

11 warrant were taken almost verbatim from the search warrant that

12 you had drafted several days earlier?

13 A.    Probably was, ma'am.

14 Q.    Okay.  So when you said you were under time constraints

15 and that had to do with the errors, you were really only adding

16 a few paragraphs to your affidavit for consideration, correct?

17 A.    Plus the warrant and Attachment A of the other warrant.

18 Q.    So when you say the warrant you're talking about the

19 search warrant, the two-page document?

20 A.    Which one are you talking about, ma'am, for the Facebook

21 or the residence?

22 Q.    For the residence.

23 A.    Okay.  I'm sorry.  Your question?

24 Q.    I'm sorry.  The question was when you say you had to

25 draft the search warrant how many pages is the search warrant

1  itself?

2  A.      Including Attachment A, three.

3  Q.      Okay, and does the Court have a copy of Government's

4  exhibit 1?

5           JUDGE SESSIONS:  Yes.

6  BY MS. KAMPMANN:

7  Q.      Okay.  So we're basically talking about one paragraph on

8  the search warrant itself?

9  A.      Yup.

10  Q.      The cover page, correct?

11  A.      Yes, ma'am.

12  Q.      And on attachment -- or the following page we're talking

13  about four very short paragraphs?

14  A.      Yup.  Yes, ma'am.

15  Q.      And on -- when you refer to Attachment A we're talking

16  about, again, four short paragraphs?

17  A.      Yes, ma'am.

18  Q.      Now you said you didn't know whether anyone else lived

19  at that residence.  Were you referring to the main residence or

20  the apartment when you said that?

21  A.      Both.

22  Q.      And had you done any record checks to see whether anyone

23  else resided there?

24  A.      Through state history -- state records they had past

25  tenants in the apartment building, but they had since moved

1   out.

2   Q.    Okay, and you were unaware of whether any other tenants

3   had moved in?

4   A.    Right.

5   Q.    So when you say you didn't know whether anyone else

6   lived there you just assumed that no one else was living there

7   at that point?

8   A.    Yes.

9   Q.    And after you had arrested Mr. Cyr I'm assuming both of

10  those homes at 1779 and 1781 were secured by law enforcement?

11  A.    And the vehicle.

12  Q.    And the PT Cruiser?

13  A.    Yes, ma'am.

14  Q.    Okay.  And if I can ask you to look at paragraph -- if I

15  can have just a moment, Your Honor.  Well if I can first ask

16  you to look at the search -- your affidavit that's attached to

17  the search warrant paragraph 19.  Okay.  Have you had a chance

18  to look that over?

19  A.    Yes, ma'am.

20  Q.    Is that referring to the real property?

21  A.    The real property.

22  Q.    Well doesn't it say the real property consists of?

23  A.    Okay.  Then yes as it's written.

24  Q.    I'm sorry.  Let me ask the question.  In paragraph 19

25  the second sentence does it say the real property consists of?

1  A.    19 the second sentence?  Yes.  The real property

2  consists of.  Yes.

3  Q.    And then there's an address.  Correct?

4  A.    Uh-huh.

5  Q.    And can you characterize for the Court what is listed

6  after that?

7  A.    It's a copy and paste from the Attachment A.

8  Q.    I'm sorry.  What was the first word you said?  It's a --

9  A.    I used -- it was a copy and paste from another section

10 of the warrant.

11 Q.    Okay.  But what it includes are items, correct?

12 A.    Yes, ma'am.

13 Q.    It's not a description of real property?

14 A.    This was one of the corrections that the State's

15 Attorney wanted me to correct.  He wanted this in the

16 affidavit.

17 Q.    So the State's Attorney told you -- where it asks you to

18 describe real property to instead -- or did he tell you where

19 to put it or you just had to figure out where to put it?

20 A.    I figured out where to put it.

21 Q.    Okay.  So where it says the real property consists of

22 you then listed items to be seized, correct?

23 A.    Yes, I did.

24       JUDGE SESSIONS:  But the State's Attorney would have

25 told you that you should list the items that you were seeking

1  to discover in the residence in the affidavit at some

2  particular point related to the residence, and that's what you

3  decided to do?

4          DETECTIVE CLOUATRE:  And that's what it is.

5  BY MS. KAMPMANN:

6  Q.     Did the State's Attorney see this document after you had

7  made any changes?

8  A.     He did not.

9  Q.     In paragraph 20 of that affidavit where it's describing

10 the photo array that was shown to the complainant in this case,

11 you were also present for that, correct?

12 A.     Yes, ma'am.

13 Q.     And I've listened to it.  It says in here she advised

14 that the eyes and the jaw line resembled the man that she met.

15 Where did you get the part about the jaw line?

16 A.     That's what I had taken from the interview.

17 Q.     Were you just working from memory?

18 A.     Yes, ma'am.

19 Q.     So if you had a chance to go listen to it later and that

20 is consistent with my listening to it and she said nothing

21 about jaw line, you just remembered incorrectly?

22 A.     Yes, ma'am.

23 Q.     In paragraph 29 -- or, I'm sorry, 23 of your affidavit

24 -- before I ask you about that, you testified that you had the

25 property secured and the part of the reason that you felt so

1   pressured was that the mother was going to be coming home,

2   correct?

3   A.    Yes, ma'am.

4   Q.    And so you included information about that in your

5   affidavit, correct?

6   A.    Probably unfamiliar where though.

7   Q.    And to help you out let me -- so if you look at the

8   paragraph 23, the very last line that starts with Cyr?

9   A.    Yes, ma'am.

10  Q.    And read on to the next page to yourself if you'd like.

11  A.    Yes, ma'am.

12  Q.    So you recollect Mr. Cyr said that his mother wouldn't

13  be home until -- or she wouldn't finish work until 11 and she

14  was expecting him to pick her up, correct?

15  A.    Yes, ma'am.

16  Q.    But at paragraph 29 you then tell the Court as of the

17  date of the application it's 8 o'clock that she's due to

18  return?

19  A.    That's a typo.

20  Q.    In that same paragraph you say -- you mention that the

21  building is secured, and then you say "and good cause exists

22  for entry and search of the residence."  Can you tell us what

23  you mean by good cause?

24  A.    This was also a verbiage of the State's Attorney.  He

25  was advising me to throw that into this paragraph.  This is not

1  my verbiage.  This was the State's Attorney's who was helping

2  me with this with -- this was part of his corrections.

3  Q.    Okay.  Were these corrections relayed to you in print or

4  verbally?

5  A.    Verbally.  I was on the phone with him while we were

6  making these corrections.

7  Q.    Okay.  Is it possible that he said probable cause?

8  A.    Probably.

9  Q.    And you wrote good cause; is that correct?

10  A.    Yes, ma'am.

11  Q.    If you turn to the next page, it starts with paragraph

12  4.  Where are paragraphs 1 through 3?

13  A.    This was also a copy and paste off a boilerplate and I

14  did not correct the numbers.

15  Q.    Okay.  And then turning to the next page -- and I'm

16  sorry, mine don't have page numbers.  Okay.  So it would be the

17  following page, subparagraph D.  Do you see that?  Could you

18  just read that to yourself for a moment to familiarize yourself

19  with it?

20  A.    Yes, ma'am.

21  Q.    Is that another cut and paste from a child pornography

22  search warrant?

23  A.    Yes, ma'am.

24  Q.    Okay, but you didn't have any evidence suggesting that

25  there was any child pornography on Mr. Cyr's computers,

1  correct?

2  A.    Not at that time, no.

3  Q.    And then further down paragraph 7 subsection A it's the

4  volume of evidence.  Can you just read that to yourself please?

5  A.    Yes, ma'am.

6  Q.    Okay.  So at the very end you're basically saying that

7  because it's a computer and it can contain a lot of storage

8  that it could contain evidence or instrumentalities of crime,

9  correct?

10  A.    That's what it says, ma'am.

11  Q.    All right.  You didn't specify what type of crime?

12  A.    No, I did not.

13  Q.    So just basically any crime that might be, correct?

14  A.    Yes, ma'am.

15  Q.    And then finally with respect to this affidavit on

16  paragraph 9 you are there essentially -- I'm sorry.  Do you

17  need a second to review it?

18  A.    Please.

19  Q.    Sure.

20  A.    Yes, ma'am.

21  Q.    Okay.  So you are there basically asking the Court's

22  permission to seize computer hardware, and in parentheses it

23  says "associated peripherals"?

24  A.    Yes, ma'am.

25  Q.    Is that defined anywhere in this document?

1  A.    No, it's not.

2  Q.    And it says "that are believed to contain some or all of

3 the evidence described in the warrant," and drawing your

4 attention back to the warrant itself you are referring, I

5 presume, to Attachment A?

6  A.    Yes, ma'am.

7  Q.    Okay. So let's look at Attachment A. And actually just

8 to finish up one earlier matter, on page 2 of the search

9 warrant itself --

10  A.    Attachment A?

11  Q.    No. I'm sorry. Just the search warrant page 2.

12  A.    Okay.

13  Q.    It doesn't indicate there that Attachment A is

14 incorporated into the warrant, correct?

15  A.    No, it does not.

16  Q.    So then we go to Attachment A which is basically a stand

17 alone document, correct?

18  A.    It would seem that way.

19  Q.    All right, and that paragraph one talks about all

20 records related to violations of the statutes listed on the

21 warrant and involving Richard Cyr, correct?

22  A.    Yes, ma'am.

23  Q.    But there are no statutes listed on the warrant,

24 correct?

25  A.    Correct.

1  Q.    It then talks about any computers or electronic devices

2  and media that were or may have been used as a means to commit

3  the offenses, correct?

4  A.    Yes, ma'am.

5  Q.    Okay.  So that's speculation that there might be

6  something there that might have been used?

7  A.    Regarding to the reason why that was in there was

8  because of the luring the child via the internet with

9  computers.  It was speculation of the computers I mean because

10 you can access the internet through any of the electronic

11 media.

12 Q.    Well use of the internet itself is not illegal, correct?

13 A.    Yes, ma'am.  No.

14 Q.    All right, and when you talk about as a means to commit

15 the offenses described on the warrant, there are no offenses

16 described on the warrant?

17 A.    Right.

18 Q.    Okay.  You go on to say including receiving images of KS

19 over the internet?

20 A.    Correct.

21 Q.    And you would agree receiving images of KS over the

22 internet is not illegal?

23 A.    Depending on what the content of the photos were.

24 Q.    Well she had told you that all she sent were head shots,

25 correct?

1  A.    Right.

2  Q.    And you would agree that head shots of KS being sent

3  over the internet is not illegal?

4  A.    That's true.

5  Q.    And you also say "including web sites involving luring

6  children and minors."  Correct?

7  A.    Yes, ma'am.

8  Q.    What did you mean by that?

9  A.    With Facebook, but Facebook wasn't listed because that

10  was the suspected site of what was going on.

11  Q.    Okay.  If there were a web site that talked about luring

12  children, that in and of itself wouldn't be illegal, correct?

13  A.    Right.

14  Q.    And then paragraph 3 it says "for any computer hard

15  drive or other electronic media, hereinafter media, that is

16  called by this warrant," and you're referring to the search

17  warrant, correct?

18  A.    Yes, ma'am.

19  Q.    Which doesn't list a crime?

20  A.    Right.

21  Q.    "Or that might contain things otherwise called for by

22  this warrant forthwith."  What does that mean?

23  A.    I don't have an answer for you.

24  Q.    Did -- well let me ask you this, Detective.  Did you

25  actually draft this verbatim or did you cut and paste from

1 several different documents?

2 A.     It started as a cut and paste and also -- no.  It

3 started as a cut and paste.  That's pretty much what it was.

4 It was a cut and paste.

5 Q.     Okay.  Paragraph 1 again talks about all records, and

6 then you again go back to that in paragraph 4.  Correct?

7 A.     As used above the term records, is that what you're

8 talking about?

9 Q.     Right.

10 A.     Correct.

11 Q.     "As used above records and information," and information

12 is in quotes, correct?

13 A.     Yes.

14 Q.     Had you referred to information previously?

15 A.     No.

16 Q.     Okay.  "Including all of the foregoing items in computer

17 electronic storage."  Correct?

18 A.     Yup.

19 Q.     And in parentheses you then list out hard disks.  Are

20 you talking about a -- literally about a disk?

21 A.     I was probably talking about hard drives.

22 Q.     Okay.  So that's a typo.  "Or other media that can store

23 data, including cell phones and personal data assistants."

24     Now you had asked -- basically the evidence that you had

25 at this point was that all of the communication that

1  complainant said she had with Ann Clancy was via Facebook,

2  correct?

3  A.     Yes, ma'am.

4  Q.     She didn't tell you that she had had a cell phone

5  conversation with her or with Mr. Cyr, correct?

6  A.     No.

7  Q.     And you had -- by this time you had interviewed Mr. Cyr,

8  correct?

9  A.     Yes, ma'am.

10  Q.     And you knew he didn't have a cell phone?

11  A.     Right.

12  Q.     So you asked for cell phones.  You just threw that in

13  there?

14  A.     No because cell phones can also get on to the internet.

15  They can also access Facebook, especially the smartphones.

16  Smartphones was not instead of cell phones.  I didn't use

17  smartphones.  That's the reason why that information is there.

18  Q.     Okay.  But you didn't have any reason to believe that a

19  cell phone or a smartphone had been used to access the

20  internet?

21  A.     No, ma'am.

22  Q.     Or communicate with the internet?

23  A.     No, ma'am.

24  Q.     You follow that up with "any handmade form such as

25  writing, drawing, painting;".  Any handmade form such as

1  writing, drawing, or painting of what?

2  A.    Photos, any handwritten notes, maybe records that he was

3  using for keeping track of what he was doing.  That's why that

4  information is there.

5  Q.    Okay, but at this point you've got plenty of Facebook

6  exchanges, correct?

7  A.    Yes, ma'am.

8  Q.    And you know that whatever communication is going on is

9  going on through Facebook?

10  A.    Yes, ma'am.

11  Q.    Okay.  There was nothing -- the complainant didn't tell

12  you that she sent -- for example, anyone sent her a letter?

13  A.    No.

14  Q.    Or drawing?

15  A.    No.

16  Q.    Or notes?

17  A.    No.

18  Q.    And then it says "any mechanical forms such as printing

19  or typing."  Of what?  What does that refer to?

20  A.    More of like photos, if he had printed out photos or

21  photos.  Anything like such.

22  Q.    Printing or typing covers photos?  I think photos comes

23  later.  It says "and any photographic form."

24  A.    Yes, ma'am.  You're right.

25  Q.    So the printing and typing refers to what?

1   A.     If there was any Word documents concerning what was

2   going on.

3   Q.     Was there anything you had learned from your interviews,

4   your four interviews of the complainant, or I guess they hadn't

5   all occurred by this time, but let's say three interviews of

6   the complainant that led you to believe there would be anything

7   in the form of print or typing?

8   A.     Not at that time.

9   Q.     Where it says "and any photographic form" in parentheses

10   it says "such as microfilm, microfiche, prints, slides,

11   negatives, videotapes, motion pictures, photocopies," of what?

12   Was this in reference to child pornography?

13   A.     I was under the impression that maybe he had printed out

14   the photos or anything of the head shots that the complainant

15   had sent.

16   Q.     Did you have copies of those?

17   A.     Of?

18   Q.     Of the head shots?

19   A.     I had -- I did have a copy of the head shot from the

20   complainant's computer.

21   Q.     And you had no reason to believe there would be any

22   photographs of, for example, Mr. Cyr?

23   A.     No.

24   Q.     In relation to this case?

25   A.     No.

1  Q.     For example, the complainant never said well he sent me

2  photographs of him?

3  A.     There was no -- there was a photo of an erect male

4  penis, but there was no photos of Mr. Cyr.

5  Q.     Well that comes later, correct?

6  A.     I believe so, ma'am.

7  Q.     That has nothing to do --

8  A.     And the warrant and the Facebook warrant.

9  Q.     Right.  That has nothing to do with anything that you

10  know leading up to this, correct?

11  A.     Right.

12  Q.     And you testified earlier that the search warrant, I

13  think you said, was for computers?

14  A.     And electronic media.

15  Q.     Okay, but in fact as you can see here you actually asked

16  for a lot more than that, correct?

17  A.     Yes, ma'am.

18  Q.     But you know that really all you had any evidence of was

19  Facebook communication?

20  A.     Yes, ma'am.

21  Q.     And this Attachment A doesn't say anything about

22  cameras, correct?

23  A.     Give me a moment please.

24  Q.     Sure.

25  A.     Electronic devices and media can be construed as cameras

1  though.

2  Q.      I'm sorry.

3  A.      The electronic devices and media can be construed as

4  cameras.

5  Q.      Well when you apply for a warrant don't you typically

6  specifically request cameras?

7  A.      Yes, ma'am.

8  Q.      But you didn't in this one?

9  A.      No, ma'am.

10  Q.      But you seized cameras?

11  A.      Yes, I did.

12  Q.      And you also seized a recording device?

13  A.      Yes, I did.

14  Q.      And where in the warrant are you authorized to do that?

15  A.      With the -- give me a second please.

16  Q.      Okay.

17  A.      I think with the construction of the electronic devices,

18  because it wasn't spelled out, we did seize a camera and the

19  recording device.

20  Q.      Because at that time you were trying to figure out

21  whether it covered it, correct?

22  A.      No, ma'am.

23  Q.      You just assumed it covered those items?

24  A.      Yes, ma'am.

25  Q.      And a recording device?

1  A.     Electronic device.

2  Q.     Recording device?

3  A.     Under the -- I linked it under the electronic device.

4  Q.     You're saying -- I'm sorry.  Are you saying that falls

5  under electronic device?

6  A.     That's where I put it.

7  Q.     Oh can you show me where?  I'm sorry.

8  A.     Where I -- when we seized that item I put it under, you

9  know, for the electronic device.  It's not in the warrant.

10        JUDGE SESSIONS:  He thought of it as part of -- as

11 authorized by that expression electronic device.

12 BY MS. KAMPMANN:

13 Q.     And so when you say you put it, do you mean on the

14 inventory?

15 A.     Yes, ma'am.

16 Q.     Okay.

17        THE COURT:  Well did you actually designate the

18 recording device as electronic or did you just seize it because

19 you thought it was covered by electronic?

20        DETECTIVE CLOUATRE:  I seized it because I thought it

21 was under electronic device.

22        THE COURT:  But you didn't designate it as an

23 electronic device?

24        DETECTIVE CLOUATRE:  I designated it as a recorder.

25 BY MS. KAMPMANN:

1  Q.    You also -- you also seized a cell phone that belonged

2  to Carmella Cyr, correct?

3  A.    I believe so.  Yes.

4  Q.    And she told you that was her phone, correct?

5  A.    Yes.

6  Q.    And that Richard Cyr did not use it, correct?

7  A.    I don't recall that part of the conversation, no.  I

8  knew it was mom's phone, but I don't recall having a

9  conversation he did not have access to it or not.

10 Q.    Well do you recall telling her that even though it was

11 hers and she was the only one who used it that in your

12 estimation he might have had access?

13 A.    I don't recall if that was me or not; if it was somebody

14 else.

15 Q.    Okay.  And her laptop computer was taken for the same

16 reason?

17 A.    Yes, ma'am.

18 Q.    Okay.  And she had told you that was her laptop computer

19 with her artwork and poetry and such?

20 A.    I don't recall the conversation.

21 Q.    Incidentally was there any recording of the interview of

22 Mr. Cyr at his residence?

23 A.    No, there was not.

24 Q.    So Judge Gerety signed off on that search warrant at

25 close to 10 o'clock, correct?

1  A.    Yes, ma'am.

2  Q.    And you picked up the phone and called somebody to say

3  go ahead and start searching?

4  A.    Yes, ma'am.

5  Q.    Okay.  They didn't have a copy of the search warrant?

6  A.    No.  I did.

7  Q.    But you weren't there, correct?  You weren't at the

8  residence?

9  A.    I brought it with me.

10  Q.    Well start with the first question.  You weren't there

11  at the time that the search started, correct?

12  A.    No, I was not.

13  Q.    And nobody there had a copy of the search warrant?

14  A.    No.

15  Q.    And you said that you went from the SIU to the high

16  school to pick up Carmella Cyr?

17  A.    Yes, ma'am.

18  Q.    And she got off work at about 11:10.  So you would have

19  picked her up then, correct?

20  A.    It was around 11, yes.

21  Q.    Okay.  So the search is going on for a full hour and

22  you're not there, correct?

23  A.    Yes, ma'am.

24  Q.    And there's no search warrant there, correct?

25  A.    Correct.

1  Q.    And you probably get there, what, close to 11:30?

2  A.    No.  It was after.  It was between 11 and 11:30.  Maybe

3  quarter after.  Quarter after 1.

4  Q.    And there were how many officers searching?

5  A.    Seven and eight.

6  Q.    Did you provide them each with a copy of the search

7  warrant?

8  A.    I did not.

9  Q.    And, in fact, you weren't there supervising the search,

10 someone else was?

11 A.    Yes, ma'am.

12 Q.    And that individual didn't have the search warrant?

13 A.    No, ma'am.

14 Q.    And you told us today that you believe the search

15 warrant was for computers and electronic media and such,

16 correct?

17 A.    Yes, ma'am.

18 Q.    And that you told whoever you spoke to that?

19 A.    Yes, ma'am.

20 Q.    Okay, but you don't disagree that there were

21 miscellaneous papers seized as well?

22 A.    I agree.

23 Q.    Are you saying that your interview of Mr. Cyr ended at 8

24 or that's just when you made the phone call to the court clerk

25 to talk about conditions and bail?

1  A.    That's when I made the phone call to the court clerk.

2  Q.    Okay.  The interview ended sometime prior to that,

3  correct?

4  A.    I believe so.  I don't have the exact time.  I believe

5  it was roughly around three hours, the interview.

6  Q.    Okay.  So maybe around 7?

7  A.    Probably.

8  Q.    Okay.  And you said you finished your search warrant

9  application at 9?

10 A.    Yes, ma'am.

11 Q.    Okay, and it was another hour before you contacted the

12 judge?

13 A.    Well the corrections with the State's Attorney, him

14 reviewing it, all that, that took a little time.

15 Q.    Actually you know what.  I think I misspoke.  I think

16 you told us you called him around 9:30.  Was that about right?

17 A.    Yes, ma'am.

18 Q.    All right.  So you had basically two and a half hours to

19 work on this?

20 A.    Yes, ma'am.

21 Q.    With an affidavit that already had 17 paragraphs and

22 background information?

23 A.    Yes, ma'am.

24 Q.    So I'm assuming you have had -- when you say that there

25 were time constraints, two and a half hours to be able to

1 finish up those portions of the search warrant is a pretty good

2 amount of time, correct?

3 A.    No.  It was a rush job.

4 Q.    Well that -- but you knew that Carmella Cyr wasn't even

5 going to be off of work until 11, correct?

6 A.    Yes, ma'am.

7 Q.    So you actually had more time, had you wanted it, to go

8 back and go over things, correct?

9 A.    At the time, again, we were dealing with the constraints

10 of the Vermont state warrant of we had no idea that we were

11 even going to be granted the exception to serve the warrant

12 past 10 clock if need be.  So I was trying to get it all done

13 within that time frame.

14 Q.    Well okay.  So you still have two and a half hours,

15 correct?

16 A.    Yes, ma'am.

17 Q.    Okay.  Was it the next day that you provided a copy of

18 the inventory?

19 A.    I believe so.

20 Q.    So you didn't leave one at the house that night?

21 A.    No, ma'am.

22 Q.    That was finished up some time later?

23 A.    Yes, ma'am.

24 Q.    One of the items on the inventory talks about I think --

25 well I think there are about 17 flat screen monitors that were

1  taken?

2  A.     I don't think we took the monitors.

3  Q.     No.

4  A.     We took the towers, not the monitors.

5  Q.     I'll come back to that in just a minute.  Fair to say

6  that you didn't take all of the computers from the residence?

7  A.     We did not.

8  Q.     You took some, you left others?

9  A.     The ones that were smashed, missing pieces, things like

10 such that haven't been used for a while, those were the ones we

11 left.

12 Q.     Okay.  And do you have -- I don't know whether I've

13 given this to you.  Do you have a copy of the inventory in

14 front of you?

15 A.     No, ma'am.

16         MS. KAMPMANN:  If I can get this marked?

17 (Defendant Exhibit A marked for identification.)

18 BY MS. KAMPMANN:

19 Q.     I'm going to show you what is marked as Defendant's --

20 I'm sorry.  I'm showing you what's marked Defendant's Exhibit

21 A.  Do you recognize that?

22 A.     Yes, ma'am.

23 Q.     Is that the inventory from the search of Mr. Cyr's home?

24 A.     The main residence, the apartment, and the vehicle, yes.

25 Q.     Okay.  And do you see the very last page?

1   A.     Yes, ma'am.

2   Q.     Does it show the monitors?

3   A.     Yes, but we did not take these monitors. The camera,

4   the Sony camera down third from the bottom, but not the Dell

5   monitors.

6   Q.     So this inventory is incorrect?

7   A.     Yes, ma'am.

8   Q.     And this is something you prepared after the search back

9   at your office?

10   A.     These were also written during the search. We do not

11   have the monitors.

12   Q.     So that's inaccurate?

13   A.     Excuse me.

14   Q.     Is that inaccurate?

15   A.     Inaccurate for?

16   Q.     Is that inaccurate?

17   A.     The monitor end of it, yes, it is.

18   Q.     Do you want to take a look at that and let us know

19   whether there's any other thing that's inaccurate about it?

20        MS. NOLAN: Your Honor, objection to relevance.

21        JUDGE SESSIONS: Well to the extent that good faith

22   is a relevant issue that opens up the door to any conduct by

23   the officer in executing the warrant. So objection overruled.

24   A.     Except for the last page it all looks correct.

25   Q.     Did you file this document with the Court?

1  A.    Yes, ma'am.

2        JUDGE SESSIONS:  All right.  It is just about 11

3  o'clock.  This is a good time for a break at this point.  So

4  let's take a 15-minute recess and be back at quarter after.

5  (Recess 10:57 - 11:19 a.m.)

6        JUDGE SESSIONS:  Okay.  Ms. Kampmann.

7        MS. KAMPMANN:  Thank you.

8  BY MS. KAMPMANN:

9  Q.    Detective Clouatre, referring to Defendant's exhibit A

10 which is the inventory, on page 1 it says "I entered at".  What

11 time is written there?

12 A.    I can't read the writing, ma'am.

13 Q.    Is that your handwriting or someone else's?

14 A.    It looks like mine.

15 Q.    Does it appear to be 22:45?

16 A.    It could be.  22:05.

17 Q.    Okay.  So that would be 10:05 p.m.?

18 A.    Yes, ma'am.

19 Q.    Okay.  You didn't enter any residence at 10:05 p.m. that

20 night?

21 A.    I did not.  No.

22 Q.    And reviewing that same exhibit, Defendant's exhibit A,

23 can you tell us where it lists the contents of box three?

24 A.    No, ma'am.

25 Q.    So we don't know what is in box three, correct?

1  A.     No.

2         MS. KAMPMANN:  I move for the admission of

3  Defendant's exhibit A.

4         JUDGE SESSIONS:  Any objection to A?

5         MS. NOLAN:  No, Your Honor.

6         JUDGE SESSIONS:  So admitted.

7  (Defendent Exhibit A admitted.)

8  BY MS. KAMPMANN:

9  Q.     And we talked before the break about the fact that you

10 left some computers, you took some computers.  Are you saying

11 that you were able to tell just visually whether a computer

12 worked or not?

13 A.     If it's missing half the pieces we -- or missing a hard

14 drive or anything like that, we left it.  If it was -- looked

15 like it just wasn't used at all period for a long period of

16 time, we left it.

17 Q.     So it just depended?

18 A.     Pretty much.

19 Q.     And you're aware that -- you're aware that, and I think

20 we went over this a little bit, but that miss -- a fair amount

21 of paperwork was seized in this case, correct?

22 A.     Yes, ma'am.

23 Q.     Okay, and you didn't detail what that was?

24 A.     I did not.

25 Q.     What box was that in?

1  A.    It was bag one.

2  Q.    Okay.  And that was seized in spite of the fact that you

3  informed them that the warrant was for computer equipment,

4  correct?

5  A.    Yes, ma'am.

6  Q.    And you testified on direct that Mrs. Cyr was present

7  for the whole search of the house, and I just want to clarify

8  you mean once you brought her to the house, correct?

9  A.    Once I brought her to the house, yes.

10 Q.    Okay.  And if she got off work at 11:10, how long do you

11 estimate it took you to get to her house?

12 A.    A little over five minutes at most.

13 Q.    Okay, and so it would -- and what time did that search

14 end?

15 A.    Approximately midnight.

16 Q.    Okay.  So she was not there for the whole search?

17 A.    No.

18 Q.    And on the rare occasion where you asked her about items

19 that were hers and she informed you they were hers, those were

20 seized anyway, correct?

21 A.    Like I stated, I don't recall that conversation.

22 Q.    You listed, for example, on one of these items you

23 designated it as hers.  How would you have known that?

24 A.    Probably what was told to me.

25 Q.    By her?

1  A.     No.  By the officer.  I do not remember who that officer

2  was.

3  Q.     And so when you say you went through all of the items to

4  make sure they conformed, you did that the next day as you were

5  doing the inventory?

6  A.     Yes, ma'am.

7  Q.     You didn't do that at the house that night?

8  A.     Partially.  I didn't do a complete job while at the

9  residence.

10  Q.     Okay.  And have you given back any of the items that

11  shouldn't have been seized?

12  A.     No.

13  Q.     And what about the items that turned out to have

14  absolutely no evidence -- evidentiary value whatsoever, have

15  any of those been returned?

16  A.     They have not.

17        MS. KAMPMANN:  If I can just have one moment.

18        JUDGE SESSIONS:  Yes.

19  BY MS. KAMPMANN:

20  Q.     I just have one last question to clarify.  With respect

21  to the monitors that you say were not seized, was that part of

22  the inventory filled out that night or the next day?

23  A.     It was filled out that night because the --

24  Q.     The next day when you went through the inventory you

25  didn't cross those out?

1   A.      If I can call your attention to the last page?

2   Q.      Just one moment, Detective.  Yes.

3   A.      The actual detail of the each item -- each items that is

4   not my handwriting.  It is another officer's.  So all this was

5   stacked within the same paperwork that I went through the day

6   after.  These items were not on there in the -- of the items

7   that were seized.

8   Q.      So this inventory was actually put together by more than

9   one person?

10  A.      Yes, ma'am.

11  Q.      Do we know who the other person is?

12  A.      I don't recall.  No.

13          MS. KAMPMANN:  Okay.  Thank you.

14          JUDGE SESSIONS:  Okay.  Ms. Nolan, any questions?

15          MS. NOLAN:  Just one moment, Your Honor, if I may.

16                      REDIRECT EXAMINATION

17  BY MS. NOLAN:

18  Q.      Detective, there's no box where you even mention other

19  inventory, correct?

20  A.      No, ma'am.

21  Q.      So did you just go to box four after box two

22  accidentally or inadvertently?

23  A.      That's a very good assumption.

24  Q.      So there's not some box -- is there some box of evidence

25  that exists that you haven't told anyone about?

1  A.     No.

2  Q.     When you talked to the Captain -- you testified earlier

3  you talked to the Captain, you told him what statutes were

4  under -- you had probable to search for, correct?

5  A.     Yes, ma'am.

6  Q.     And you told him about what types of items you had

7  probable cause to seize, correct?

8  A.     Yes, ma'am.

9  Q.     Do you recall you said you testified you told him about

10  electronic media and computers --

11  A.     Yes, ma'am.

12  Q.     -- essentially?

13  A.     Yes, ma'am.

14  Q.     Do you recall if you told him that certain types of

15  paperwork and other types of evidence could be seized?

16  A.     I don't recall, no.

17  Q.     Okay.  Was it your understanding that he was going to

18  communicate what you told him to the search team?

19  A.     Yes.

20  Q.     And when you got there, to the extent you could, did you

21  review what had been seized?

22  A.     Yes.

23  Q.     And you made a determination that it fell within the

24  search warrant?

25  A.     Yes.

1  Q.    Some of your review occurred when you got back to the

2  police station?

3  A.    To the Sheriff's Department.  Yes.

4  Q.    Did you spend some time after you finished the interview

5  with Mr. Cyr -- I just want to be clear -- and between the time

6  that you started drafting the warrant and the time that you

7  finished the interview with Mr. Cyr, did you spend some time

8  coordinating with the court about him making his appearance?

9  In other words, phone calls about his arrest and court

10 conditions, and that type of thing?

11 A.    Only the court conditions.  When I had the conversation

12 with Judge Gerety he -- I kind of gave him the Reader's Digest

13 version, if you will, of what was going on.  As far as to him

14 being -- going to court, no, I did not have any kind of

15 conversations like that.

16 Q.    When you say you called for court conditions who did you

17 call?

18 A.    It was a court clerk.  I believe it was Terry Scott if I

19 remember right.

20 Q.    And that was in between the time you finished the

21 interview and the time you started drafting the warrant?

22 A.    Yes.

23 Q.    Now you said you had information about Mr. Cyr

24 communicating with one minor over Facebook at the time you

25 applied for the warrant, correct?

1 A.    Yes.

2 Q.    For the residence and the vehicle?

3 A.    Yes.

4 Q.    Did you know for sure whether he communicated through

5 other means with minors or attempted to lure minors through

6 other means?

7 A.    For sure, no.  It was a speculation.

8 Q.    That's the point of the search, right?

9 A.    Yes.

10 Q.    And you said you had cut -- you said you had cut and

11 pasted parts -- or did you -- let me ask you this.  Attachment

12 A is it entirely a cut and paste job?

13 A.    Not entirely, no.

14 Q.    Okay.  So some of that language you used before; is that

15 correct?

16 A.    Yes.

17 Q.    Child exploitation search warrant and affidavit?

18 A.    I have not done any child exploitation search warrant

19 before.  This is one of my first ones.

20 Q.    This is language you have used before in the past?

21 A.    Yes.

22 Q.    And some of that language is specific to this case?

23 A.    Yes.

24 Q.    Did you read Attachment A?

25 A.    I did.

1  Q.    You did.  Sorry.  I didn't get the answer.

2  A.    Yes, I did.

3  Q.    Before you sent it to the judge?

4  A.    Before I sent it I went over it with the State's

5  Attorney.

6  Q.    Okay.

7  A.    He didn't have any issues with it.

8  Q.    Okay.

9  A.    And I haven't touched it since.

10  Q.    Okay.  But you read it?  I mean you read the attachment

11  before you sent it to the State's Attorney?

12  A.    Yes.

13  Q.    And then paragraph 11 -- well do you have the affidavit

14  in front of you?

15  A.    Yes, ma'am.

16  Q.    Does paragraph 11 -- there's been some talk about KS

17  sending a head shot of herself to the Defendant?

18  A.    Yes.

19  Q.    And that's referenced in paragraph 11 of the affidavit?

20  A.    Yes, it is.

21  Q.    And yet you testified it's not illegal in itself to

22  receive a head shot of a minor; is that correct?

23  A.    Right.

24  Q.    It is illegal to use the internet to lure a minor to

25  engage in illicit sexual activity, correct?

1  A.    Yes.

2  Q.    And could obtaining pictures of the minor be part of the

3  scheme to lure them into sexual activity?

4  A.    It could be.

5  Q.    And your search -- in your search you were looking for

6  other pictures -- is it true you were looking for other

7  pictures that might be part of that scheme?

8  A.    Yes.

9  Q.    And exhibit -- I'm sorry.  Paragraph 23 of exhibit 1,

10  you take a look at that and tell the Court if it references

11  1779 Tatro Hill Road and also the PT Cruiser, listing

12  specifically the Vermont registration of the PT Cruiser?

13  A.    It does.

14  Q.    And then in terms of what KS reported during the first

15  interview I guess it was, was it on October 17, 2013?

16  A.    Yes.

17  Q.    Is what she reported summarized in paragraph 13 of the

18  affidavit, at least in part, part of what she reported?

19  A.    Yes.

20  Q.    And does that paragraph include a summary of sexual

21  contact she reported with Mr. Cyr engaging in some form of

22  sexual contact?

23  A.    It does.

24        MS. NOLAN:  I don't have any more questions, Your

25  Honor.  Thank you.

1      JUDGE SESSIONS:  Okay.  Any further questions?

2      MS. KAMPMANN:  Just a couple of follow-ups.

3                    RECROSS EXAMINATION

4  BY MS. KAMPMANN:

5  Q.    Just to be clear sexual contact under the statute, that

6  paragraph doesn't fit the definition of sexual assault, does

7  it?

8  A.    No.  Sexual assault, no.

9  Q.    I was a little confused.  You said that you sent the

10 affidavit to -- or the search warrant to the State's Attorney.

11 Did you send everything to the State's Attorney?

12 A.    This whole packet, yes.

13 Q.    Okay.  And you said he didn't have any problems with it?

14 A.    Other than the affidavit which we made corrections on.

15 Q.    Okay.  And you testified to that on cross, correct?

16 A.    When I first got up here.

17 Q.    Well actually I'm the one that brought up the issue of

18 you said good cause and you said well I probably meant probable

19 cause.

20 A.    Okay.

21 Q.    Okay.  And there was another issue that the State's

22 Attorney had raised with you as to where to place items or to

23 include items to be searched for, and you made it an executive

24 decision as to where to put that in the affidavit, correct?

25 A.    Yes, ma'am.

1  Q.    So it's not as though the State's Attorney didn't have

2  any issues?

3  A.    No, he didn't have any issues.  He had some issues that

4  we corrected.

5  Q.    Okay.  But he didn't review it again after you made

6  those changes, correct?

7  A.    No, he did not.

8  Q.    All right.  That's it.  Thank you.

9        JUDGE SESSIONS:  Thank you, Detective.

10        DETECTIVE CLOUATRE:  Thank you.

11        JUDGE SESSIONS:  All right.  Government call any

12  other witnesses?

13        MS. NOLAN:  No, Your Honor.  Thank you.

14        JUDGE SESSIONS:  Does the defense have any witness to

15  call?

16        MS. KAMPMANN:  We have no witness.  Thank you.

17        JUDGE SESSIONS:  Okay.  The parties have submitted

18  lengthy briefs.  Seems to cover the issues.  Are there any

19  requests to supplement briefing?

20        MS. NOLAN:  I believe we don't, Your Honor.  The

21  Government does not.

22        MS. KAMPMANN:  The defense does not.  Thank you.

23        JUDGE SESSIONS:  Okay.  All right.  So in regard to

24  argument, Ms. Kampmann.

25        MS. KAMPMANN:  Thank you, Your Honor.  I know that

1  the Government would like to explain away all of the errors in

2  this search warrant application by saying he was under time

3  constraints.  Officers are always under time constraints when

4  they are applying for search warrants, or almost always, and

5  what we have here is a search warrant that was used previously

6  and written at a time when he didn't have any sort of time

7  constraints and incorporated 17 of those paragraphs into the

8  search warrant that he ultimately submitted.

9        MS. NOLAN:  Can I just interrupt because I think it

10  might help both sides.  Did you want to admit that earlier

11  search warrant?  I don't know that we admitted it.

12        MS. KAMPMANN:  The Government's search warrant?

13        MS. NOLAN:  Government Exhibit 5, the Facebook search

14  warrant.

15        MS. KAMPMANN:  I'm sorry.  Thank you.  I did want to

16  move -- I would like to move for admission and I believe it's

17  marked as --

18        MS. NOLAN:  I know that I didn't admit Government's

19  exhibit 5 which is the Facebook search warrant which Detective

20  Clouatre obtained four days earlier.  I thought the defense

21  might want to have it.

22        JUDGE SESSIONS:  All right.  So you're seeking to

23  admit it.  Any objection on the Government?

24        MS. NOLAN:  No, Your Honor.

25        JUDGE SESSIONS:  Okay.  It is admitted.

1  (Government Exhibit 5 admitted.)

2          MS. KAMPMANN:  Do we know where it is?

3          JUDGE SESSIONS:  You can submit it.

4          MS. KAMPMANN:  Thank you.

5          JUDGE SESSIONS:  The Government is conceding that the

6  warrant was improper, that there was no incorporation of the

7  application, and they left out on the warrant on its face

8  reference to the criminal statutes that were violated.  So

9  basically they are acknowledging that the warrant's improper.

10 You have brought up a number of other mistakes in the

11 affidavits or in the application.  How do you get around the

12 Rosa case from the Second Circuit on good faith?

13         MS. KAMPMANN:  Well because this is not a case where

14 the same officer who drafted the affidavit was present from

15 start to finish of the search.  He didn't show up until well

16 after an hour into the search, and he said he had a copy of the

17 search warrant, but he didn't give it to anybody, and we don't

18 have the other officer coming in to say when he called me on

19 the phone he told me to search for A, B, C, and D, and we're

20 relying on his recollection and he's admitted at various points

21 today that it's not good and so --

22         JUDGE SESSIONS:  But his testimony was that he called

23 in once he got -- once he got the warrant from Judge Gerety he

24 called the other officers indicating exactly what the nature of

25 the crime was and specifically what he was looking for or what

1  he was authorized to search for in the warrant.  It included

2  obviously the computers, but then you get involved in issues of

3  documents and records.  In fact, that was also covered by

4  Attachment A.

5      So all of it related to a particular kind of criminal act

6  and that was all related to the other officers, and then before

7  the items were seized he came and made sure that those items

8  were appropriate based upon his own investigation.  Is that not

9  correct?

10      MS. KAMPMANN:  Well that's not my recollection of his

11  testimony.  He said he went through some of it at the house,

12  but most of it he did the next day, and there were things that

13  shouldn't have been seized that were seized.

14      JUDGE SESSIONS:  Well regardless, but still it was

15  his responsibility to make sure that the items that were seized

16  were consistent with the purpose of the warrant, and you're

17  right he said that he had done it partly at night, but then

18  also mostly the following day.  Is that significant?

19      MS. KAMPMANN:  Well I think it's significant because

20  by then the items have been seized.  The search has been

21  conducted, and for the Court to say that this was an

22  appropriate way to conduct the search why ever get a search

23  warrant.  Why should there ever be a search warrant and why do

24  you care if there's a search warrant at the premises.  Why do

25  we care that the executing officers have seen the search

1  warrant.

2      The purpose of the search warrant is to be able to let

3  them refer to it to know what the crime is and what specific

4  items the Court has authorized seizure of.  Nobody -- nobody

5  participating in this search, except Detective Clouatre who

6  showed up at least an hour and 20 minutes into the search of

7  what sounds like it was a two-hour search, he's the only one

8  who had it.  He didn't give it to anybody else, and frankly

9  judging by the numerous errors contained within this affidavit,

10  application, search warrant, I don't have confidence that

11  whatever he relayed by telephone to one officer was the

12  accurate information about what was at issue in this case.

13      JUDGE SESSIONS:  Well I appreciate that you have

14  raised a number of mistakes that were made in the affidavit and

15  the application form, but it is oftentimes the case that a law

16  enforcement in emergency situations in particular, but in other

17  situations as well, will contact the magistrate judge, other

18  officers will have secured a particular residence waiting to

19  determine whether in fact a warrant has been signed.  Then the

20  officer, once the warrant is signed, will call the executing

21  officers and tell them this is what the nature of the crime is,

22  this is what you're looking for, this is what the search

23  warrant authorizes, and they don't actually look at the search

24  warrant themselves.  They are just told by another officer this

25  is what we're after, and that's a practice that has been in

1  place for, I hate to say it, but since I've been here for

2  almost two decades.  Two decades.

3        MS. KAMPMANN:  The Rosa Court says when you have

4  facial -- a facially invalid search warrant, as you had here,

5  the only thing that can really save it is if the officer who

6  authored it is the same one who is there directing and

7  executing the search and we don't have those facts here.

8  That's just not what happened.

9        So I don't think this case falls within Rosa, and I

10 think the reason we know that is that there were items seized

11 that shouldn't have been seized based on his testimony today,

12 Detective Clouatre's testimony today.  There were things that

13 were not seized that clearly should have fallen within the

14 ambit of this search warrant that were left there for whatever

15 reason because I don't think anybody was really clear on what

16 needed to be taken and what didn't need to be taken, and having

17 a search warrant there for them to refer to would have resolved

18 any ambiguity.  We never had a search warrant distributed to

19 anybody to search two residence -- the two residences and the

20 vehicle and it doesn't fall within the exception for that

21 reason.

22        JUDGE SESSIONS:  Okay.  All right.

23        MS. NOLAN:  Well, Your Honor, we think this is about

24 as much like Rosa as a case can be.  While the Rosa case has a

25 number of aspects to it, but the main thrust of it was I think

1 two things; a defect in the search warrant which we concede

2 here. I think it's almost close to not being defective because

3 it refers to violations of statutes and it refers to child

4 exploitation, which by the way the Rosa warrant didn't. The

5 Rosa warrant didn't describe any form of criminal conduct and

6 it didn't refer to any violations of statutes. There was no

7 even illusion about the fact there were certain statutes in

8 play in that warrant, but I think the overarching point is a

9 defective warrant does not always mean that there wasn't a

10 reasonable basis to rely on it. The defective warrant does not

11 mean it's so deficient that the evidence needs to be excluded.

12 That's -- the Supreme Court has long held that. That's why we

13 have the good faith exception. The Rosa Court said you can

14 look to the application to make a determination of whether the

15 officers acted in good faith, and particularly because the

16 warrant in Rosa listed the crimes specifically, as this one

17 does, that was the main -- I think that was the driving reason

18 for the finding of good faith in that scenario.

19     There are some other similarities. The time constraints.

20 You know whether he had an hour and a half or two hours or an

21 hour to draft the whole warrant package that's not a lot of

22 time when you have that many things going on during the day

23 leading up to the drafting. He was the officer in charge of

24 the search. He couldn't be there as soon as it started, but

25 that's not unusual. There's no Fourth Amendment requirement

1 that you can't begin a search until you photocopy -- made eight

2 copies of the search warrant and application and pass them out

3 to everybody.  It is sufficient, we would submit, to brief the

4 searching officers on the parameters of the search.

5       Here, unlike in Rosa, there was no evidence in Rosa, at

6 least not that I recall, that a State's Attorney read the

7 entire warrant package, submitted comments and changes, and

8 then it went to a judge.  Here we have a State's Attorney sign

9 off.  He missed the error, of course, but he did sign off on it

10 and that goes to good faith, and of course the judge signed it.

11 That creates I don't know if presumption is the right word, but

12 typically when a judge signs a warrant that helps provide the

13 officer with a good faith basis to rely on it, and again, as I

14 said, there are allusions to statutes violated in child

15 exploitation offenses in the warrant.  They might not be

16 artfully drafted, but this warrant comes closer to

17 particularity than the Rosa warrant did.  So we are asking for

18 you not to exclude the evidence based on the good faith

19 exception, and particularly the Rosa case which just seems to

20 be very squarely on point.

21       JUDGE SESSIONS:  Okay.  Now you have also filed -- do

22 you want to respond to that?

23       MS. KAMPMANN:  I do just have a couple follow-up

24 points.

25       JUDGE SESSIONS:  Okay.

1       MS. KAMPMANN:  I noticed in Rosa they relied heavily

2   on the fact this was an inadvertent error, the omission of

3   listing the statutes in the search warrant or incorporating the

4   affidavit and the ramification into the search warrant.  This

5   wasn't inadvertent because he had done it previously.  He had

6   twice submitted a warrant that was defective on its face, and

7   the people executing the warrant never saw it, and if they had

8   they would have recognized it was defective on its face, and I

9   think also they relied heavily on the fact that it was an

10  isolated error in Rosa, the fact that he hadn't incorporated

11  the affidavit.  This is not one isolated error in this case.

12  This is a case ripe with error, and I just don't think that

13  Rosa saves the Government from what is a facially defective

14  search warrant with, you know, a lot of reckless disregard for

15  the truth going into it.  So we disagree.  The evidence should

16  be suppressed.

17      JUDGE SESSIONS:  All right.  You have also filed a

18  motion to dismiss and there's pleadings and so in support of

19  the motion to dismiss. I didn't think it was necessary to have

20  additional argument on that issue, but if you wish to make

21  additional argument, I certainly --

22      MS. KAMPMANN:  We actually discussed it ahead of time

23  and we would rest on the pleadings.

24      JUDGE SESSIONS:  All right.  The Court will take it

25  under advisement at this point and should be issuing an opinion

1    relatively soon.

2            MS. NOLAN:  Thank you, Your Honor.

3            MS. KAMPMANN:  Thank you.

4            JUDGE SESSIONS:  Thank you.

5    (Adjourned at 11:45 a.m.)

6

7

8            C E R T I F I C A T I O N

9

10       I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13                              _____

14

15

16   July 22, 2015            _____

17   Date                        JoAnn Q. Carson, RMR,CRR

18

19

20

21

22

23

24

25